CHICAGO LIFE INS. CO. v. TIERNAN et al.

TIERNAN et al. v. CHICAGO LIFE INS. CO.

(Circuit Court of Appeals, Eighth Circuit. January 5, 1920.)

Nos. 4515, 4516.

1. APPEAL AND ERROR ⬤═⇒1099(4)—FORMER OPINION ON APPEAL FROM JUDGMENT ON PLEADINGS AND RECORD HELD NOT TO CONSTRUE CONTRACT.

An opinion on a former appeal from a judgment on the pleadings and record after trial by referee, which reversed the judgment because the exceptions to the referee's report were not passed on, did not establish the law of the case as to the right to recover notwithstanding breach of condition of the contract, though that right was made an issue by the pleadings, and the opinion stated incidentally that counsel agreed the pleadings would not sustain the judgment, and the court was of that opinion.

2. COURTS ⬤═⇒356—STATE RULE REQUIRING MOTION FOR NEW TRIAL TO REVIEW FACTS NOT BINDING ON FEDERAL COURTS.

The conformity statute (Rev. St. § 914 [Comp. St. § 1537]) does not make the state practice relating to new trial, exceptions to referee's report, and rulings thereon, and review of judgment applicable in federal court, so that a state rule requiring a motion for a new trial before the findings of fact can be reviewed does not apply in the federal court.

3. APPEAL AND ERROR ⬤═⇒294—MOTION FOR NEW TRIAL IS NOT NECESSARY TO REVIEW OF FINDINGS BY COURT OR REFEREE.

A motion for a new trial is not indispensable in the federal courts to a review of findings of fact by the trial court or by a referee.

4. APPEAL AND ERROR ⬤═⇒1022(2)—REFEREE'S FINDINGS, CONFIRMED BY TRIAL COURT, ARE REVIEWABLE FOR ABSENCE OF EVIDENCE TO SUPPORT THEM.

Where an action at law is by binding agreement of the parties tried to a referee, and his findings of facts are confirmed by the trial court, such findings may be reviewed and reversed for the absence of substantial evidence to sustain them, though not for failure of support by preponderance of the evidence.

5. CONTRACTS ⬤═⇒147(1)—MEANING DETERMINED BY INTENTION OF PARTIES WHEN MADE.

Meaning of a contract is to be determined by the intention of the parties at the time the contract was made, which intention is to be deduced from

the terms of the contract and the situation existing when it was entered into.

6. DAMAGES ☞85—GENERAL DAMAGES NOT RECOVERABLE BY INSURANCE AGENT FOR BREACH OF AGENCY CONTRACT FIXING COMPENSATION, AFTER PRINCIPAL'S BREACH ON CONDITION WHERE CONDITION NOT PERFORMED BY AGENT.

Where an insurance agent's contract provided that, if he were discharged before termination of the contract without cause, he should be entitled to commissions on renewals of the policies secured by him, if he did not engage in business as agent for another insurance company, the agent could not, after his wrongful discharge, disregard the condition and recover general damages for a breach of the contract, measured by the loss of profits he would have made thereunder.

7. DAMAGES ☞85—PROMISE TO PAY AGENT CERTAIN AMOUNT ON BREACH HELD CONSIDERATION FOR AGENT'S PROMISE NOT TO ACCEPT AGENCY OF COMPETITOR AS CONDITION TO RECOVERY OF SUCH AMOUNT.

In a supplemental agreement, whereby an insurance company promised to pay its agent commissions on renewals of policies written by him, if he were discharged with or without cause, provided he did not act as agent for another company, the promise by the company was sufficient consideration for the agreement not to engage in the insurance business as a condition of recovering such commissions.

8. DAMAGES ☞85—BREACH DOES NOT RELIEVE OTHER PARTY FROM AGREED CONDITION AS TO STIPULATED DAMAGES.

Where a contract provided that an agent should receive certain sums on his wrongful discharge by the company on condition that he should not act as agent for another company, the agent cannot recover damages for the breach, under the rule that the prior breach by the company relieved him from performance of the condition.

9. DAMAGES ☞85—AGENT'S CONTRACT FOR CONDITIONAL CONTINUED COMMISSION AFTER DISCHARGE HELD TO INCLUDE BONUSES ON INSURANCE PROCURED.

A provision in a supplemental contract that an insurance agent, after his discharge, could, if he did not engage in business for another, recover commissions on renewals as specified in a paragraph of the original contract, includes in the commissions a bonus on the amount of insurance written by him, to which he was entitled by an earlier supplemental agreement modifying the original contract.

10. INSURANCE ☞84(1)—ORIGINAL AGENCY CONTRACT AND ITS SUPPLEMENTS CONSTITUTE A SINGLE CONTRACT.

Where parties to an insurance agency contract made several supplemental contracts, all of which referred to the original contract, and extended, limited, or modified its terms, the original and supplemental contracts constitute a single contract, and must be construed together.

11. INSURANCE ☞85—EVIDENCE OF PERCENTAGE OF RENEWALS OF ESTABLISHED COMPANY HELD INSUFFICIENT TO SHOW LOSS OF PROFITS BY DISCHARGED AGENT OF FAILING COMPANY.

An estimate of the value of the future profits which agents of a young experimental insurance company, which had been steadily unsuccessful for four years and was in a failing condition when it ceased insurance and transferred its business, would have received if it had not then ceased to insure, based entirely upon the normal rate of renewals or of lapsation of insurance of old, established, financially sound insurance companies, is not substantial evidence of the value of such future profits.

12. DAMAGES ☞40(2)—LOSS OF CONJECTURAL PROFITS NOT RECOVERABLE.

Future profits of a business, not susceptible of proof with any reasonable degree of certainty, but based only on speculations and conjectures of witnesses who know no facts to support an actual estimate, cannot be recovered.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13., INSURANCE ⊂∞85—DISCHARGED AGENT WHO BROKE CONDITION FOR RIGHT
    TO CONTINUED COMMISSIONS HELD LIABLE FOR AMOUNTS HE OWED THE COM-
    PANY.

   An insurance agent, who was wrongfully discharged, but who broke the
   condition prescribed to recovery of future commissions, is liable to the
   company for money loaned to him, to be repaid out of future commissions,
   and for the company's percentage of premiums collected by him before dis-
   charge.

In Error to the District Court of the United States for the District
of Kansas; John C. Pollock, Judge.

Action by Robert S. Tiernan and another against the Chicago Life
Insurance Company. Judgment for the plaintiffs for a part only of
the amount claimed, and both parties bring error. Reversed and re-
manded, with directions to enter judgment for defendant.

See, also, 214 Fed. 238, 131 C. C. A. 284.

William P. Dillard, of Ft. Scott, Kan. (Willard W. Padgett and
Charles E. Hulett, both of Ft. Scott, Kan., on the brief), for plaintiffs.

Silas H. Strawn, of Chicago, Ill. (R. H. Hollen and John Barton
Payne, both of Chicago, Ill., and Charles Blood Smith, of Topeka,
Kan., on the brief), for defendant.

Before SANBORN and CARLAND, Circuit Judges, and AMI-
DON, District Judge.

SANBORN, Circuit Judge. In an action at law in the court below,
which resulted on April 28, 1915, in a judgment against the Chicago
Life Insurance Company for $64,826.87 and interest from that date
Robert S. Tiernan and Howard L. Stout were the plaintiffs and the
insurance company was the defendant. Under a contract made
by an original writing of September 24, 1903, and six supplemental
writings of September 24, November 28, December 1, and December
5, 1903, and March 25 and May 4, 1904, which together constitute
one contract, the defendant made the plaintiffs its exclusive agents
for 5 years to solicit and obtain applications for insurance for it in
Kansas, Missouri, Colorado, Texas, Oklahoma, and Indian Territory,
and agreed among other things to allow them certain commissions
on the premiums paid on annual renewals of policies issued upon
applications obtained by them, and certain bonuses on each $1,000 of
certain insurance business procured and to be procured by them, and
the plaintiffs agreed to act exclusively as the defendant's agents and
to devote their entire time, talents, and energies to the business of
the agency during 5 years commencing on January 1, 1904. After
the parties had performed their respective parts of this agreement for
2¾ years and on September 22, 1906, the defendant transferred its
risks and insurance business to the Federal Life Insurance Company,
which assumed them, and ceased to conduct any insurance business.
At that time the plaintiffs had procured $3,316,900 of insurance for
the defendant, and of this amount there then remained in force $2,-
364,100.

⊂∞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The plaintiffs brought this action for the damages they alleged they sustained by reason of the defendant's cessation of business, and the judgment they have recovered is founded on the findings of the referee, confirmed by the court, to the effect that the value on September 22, 1906, of the commissions on the then future renewal premiums on the $2,364,100, in force on that day, which they would have received subsequent to that date if the defendant had continued in business, was $43,402.07, that the value of the renewal bonuses of $2.00 per annum per thousand dollars on that part of the $2,364,100 which should thereafter remain in force which they would have received was $33,067.40, making in all $76,469.47, that they would have received under their contract from initial premiums sufficient to have paid their expenses, and that this $76,469.47 was the value on September 22, 1906, of the future profits of which they were deprived by the defendant's cessation of business. But that on September 22, 1906, the plaintiffs owed the defendant $11,642.60, which deducted from the $76,469.47, left the plaintiffs $64,826.87, for which the judgment was rendered. The referee made special findings of fact and conclusions of law on which this judgment stands; the respective parties excepted to the findings and conclusions which condition their respective claims; the court below overruled the exceptions and confirmed the findings and conclusions of the referee.

It is a fact conceded by the pleadings, found by the referee, and confirmed by the court that the plaintiffs in November or December of 1906 organized the Central Life Insurance Company of Kansas, which was admitted to do and has done business in one of the states in the territory in which the plaintiffs were the exclusive agents of the defendants, that the Central Company commenced to do business on April 1, 1907, that the plaintiff Tiernan after that date was and is the general agency manager thereof and the plaintiff Stout was and is the president thereof, that they employed for the Central Company the bookkeeper, stenographer, and some of the subagents who were in their employment while they were general agents of the defendant, and solicited, within 5 years after the termination of their contract, some policy holders of the defendant to transfer their policies to the Central Company. By that part of the contract between these parties contained in the supplemental writing of December 5, 1903, they agreed that, if the contract should be terminated under its terms and conditions, the renewal interest of the plaintiffs as recited in section 21 of the contract should be continued for 5 years from the termination of the contract, and still longer, if the plaintiffs should remain in the employment of the defendant longer than 5 years, and—

"that should said contract be terminated by the party of the first part [the defendant] without cause, the renewals shall continue as recited in said section 21, all of which renewals are subject to the collection charge of 1 per cent. as specified in section 14 of said contract, and further upon the condition, understanding, and agreement that said parties of the second part [the plaintiffs] shall not enter into the life insurance business for any other company in said territory during a period of five years from the termination of the contract."

The defendant contends that the court below committed errors of law: (1) In that it concluded from these facts that the plaintiffs were not prevented from recovering damages measured by the value of their anticipated profits by the stipulation of their contract last cited, and by the fact that within 5 years after termination of their contract they became interested in and entered into the life insurance business for another company in the territory in which they had been the exclusive agents of the defendants, and (2) in that it affirmed the referee's finding of fact that the value of the future profits of the plaintiffs on September 22, 1906, was $76,469.47, when there was no substantial evidence to sustain that finding.

[1] At the opening of this case the defendant is met with the assertion of plaintiffs' counsel that neither of the questions presented by them is judicable by this court upon the record before it. In the first place they say that this court has already adjudged the first contention by its opinion and judgment in Tiernan v. Chicago Life Insurance Co., 214 Fed. 238, 131 C. C. A. 284, and, that by the law of the case it is forbidden again to consider or determine it. The opinion in 214 Fed. 238, 131 C. C. A. 284, clearly portrays the situation of the parties and of the case at the time it was rendered and states the reasons for the judgment of reversal based upon it. The trial court had received the report of the referee, the exceptions to that report, the evidence taken before the referee, and then without ruling on the exceptions had rendered a judgment for the defendant on its motion "for judgment upon the pleadings and record in the case." The record in the case contained the evidence which had not been brought to this court. This court said it was "confronted by an insuperable obstacle to the consideration of those assignments of error which relate to the merits of the controversy," that it "was unable to determine with sufficient certainty whether the judgment of the trial court proceeded solely upon the pleadings, or upon the pleadings and the report of the referee, or involved also a consideration of the evidence." It declared that "the interests of justice required the trial court to consider the exceptions and to confirm, reject, or modify the findings of fact, or to recommit the questions involved to the referee," and it reversed the judgment and remanded the case for further proceedings in conformity with the opinion.

It is true, as counsel for the plaintiffs declare, that the defendant in its answer had alleged that the plaintiffs within 5 years after the termination of the contract entered into the life insurance business in their territory for and as officers of the Central Company, that the defendant in its reply admitted the truth of that averment, and this court in the course of its discussion of the procedure in the case said that, if the court below did not consider the referee's report at all, then, unless evidence was considered, the judgment must have been upon the pleadings, that "in that case a question of law would arise for our notice, but counsel agreed that the pleadings will not sustain the judgment of the court. We are also of that opinion," and that in another portion of the opinion the court said that, "if the judgment was on the pleadings alone, it cannot be sustained." But these

remarks fail to persuade that the court was of the opinion that the question of law, whether or not under the contract the plaintiffs were barred from a recovery of any part of their claim by their engagement in the insurance business for the Central Company, was presented to it for final decision, much less that it seriously considered that question, or rendered or intended to render a considered and controlling opinion upon it. It did not discuss it, or declare that it adjudged it, and when the entire opinion and judgment for another trial of all the questions raised by the record and the exceptions therein are considered, they leave no doubt that this issue was not adjudged, and that now its decision may not be lawfully avoided.

[2] In the second place counsel for the plaintiffs insist that the question whether or not there was any substantial evidence to sustain the referee's findings of fact challenged by the exceptions thereto, but affirmed by the court below, may not be considered or adjudged by this court because the Supreme Court of Kansas has held that a motion for a new trial is indispensable to a review in that court of like findings challenged by such exceptions (Alexander v. Clarkson, 96 Kan. 174, 179, 180, 150 Pac. 576; Bank v. Refining Co., 89 Kan. 738, 132 Pac. 832), and no such motion has been made in the case at bar. This objection must be overruled. The practice and proceedings of the national courts, both appellate and trial, relating to motions for new trials, exceptions to reports of referees and to rulings of referees and courts, and to other means of review of the judgments of the trial courts, are not governed, controlled, or affected by the act of conformity (Revised Statutes, § 914; U. S. Compiled Statutes, § 1537), or by the statutes of the states or the rules or practice of its courts.

[3] A motion for a new trial is not indispensable to a review of a ruling or finding of a federal court or of a referee, although it may be so to a review of a like ruling or finding of a state court or a referee therein of the state in which the national court is sitting.

In the case in hand, when, on November 16, 1910, the referee filed his report, the insurance company filed exceptions thereto upon various grounds, and among others on the ground that the evidence was insufficient to sustain the referee's findings of fact. On April 28, 1915, after due consideration these exceptions were overruled by the court below. That court, by paragraph 5 of its judgment, approved, ratified, confirmed, and adopted the findings of the referee as the findings of the court on the evidence in the case.

[4] Where, as in this case, an action at law is by a binding agreement of the parties and the order of the federal court founded thereon committed to a referee to hear the evidence, find the facts and the law, and recommend the judgment, his findings of fact, confirmed by the court, are reviewable and reversible on exceptions thereto for the absence of any substantial evidence to sustain them, although not for a mere failure of support by a preponderance of the evidence. Boatman's Bank v. Trower Bros. Co., 181 Fed. 804, 806, 807, 809, 104 C. C. A. 314, 316, 317, 319; Philadelphia Casualty Co. v. Fechheimer, 220 Fed. 408, 136 C. C. A. 25, Ann. Cas. 1917D, 64; Paine v. Stand-

ard Plunger Elev. Co., 203 Fed. 242, 243, 246, 121 C. C. A. 440, 441, 444.

The supplemental contract of December 5, 1903, which conditions the decision of the first question presented by the defendant, reads in this way:

"December 5, 1903.

"Referring to contract of September 24, 1903, taking effect October 1, 1903, by and between the Mutual Life Insurance Company of Illinois, party of the first part, and Robert S. Tiernan, party of the second part, and subject to the terms and conditions thereof, it is hereby understood and agreed that, should this contract be terminated under its terms and conditions, the renewal interest of the party of the second part, as recited in section 21 of said contract, shall be continued under the terms and conditions thereof for a period of 5 years from the termination of said contract, or, should said second party remain in the employ of said first party longer than 5 years, then he shall be entitled to renewal commissions for as many years after his contract is terminated as he has been employed, but not exceeding 20 years of the life of the policy, and provided, further, that, should said contract be terminated by the party of the first part without cause, the renewals shall continue, as recited in said section 21, all of which renewals are subject to the collection charge of 1 per cent., as specified in section 14 of said contract, and further upon the condition, understanding, and agreement that said party of the second part shall not enter into the life insurance business for any other company in said territory during a period of 5 years from the termination of this contract."

[5] The question here at issue must be determined by the intention of the parties to the contract when they made it, deduced from its terms, from the situation of the parties, the subject-matter of the contract, and their purpose in making it. The contract was made between Mr. Tiernan and the defendant, and Mr. Stout subsequently acquired his interest in it. The defendant was a young life insurance company, organized and operated by men who seem to have lacked knowledge and experience or diligence and wisdom in the conduct of its business. It commenced its operations as an insurance company on January 1, 1903. It then had a subscribed capital of $150,000 and a subscribed surplus of $150,000. During that year it earned gross premiums of $84,900.65, its mortality and interest gains were $16,000, it set aside for mortality and accumulation $30,661.29, and its expenses were $95,156.79, and were $40,917.43 in excess of the margins for expenses. Mr. Tiernan was an able, energetic, efficient young man. He commenced making the contract with the defendant to act as its exclusive agent in the large territory which has been described on September 24, 1903. By December 1, 1903, the defendant had agreed to pay him for services and expenses from 60 per cent. to 75 per cent. of the first year's premiums collected on certain popular classes of policies issued by the defendant, by or through his agency, a renewal commission of 5 per cent. on the second to the sixth year's premiums paid if $50,000 should be secured by that agency in any fiscal year, 5 per cent. on the second to the tenth year's premiums if $75,000 should be so secured, 7 per cent. on the second to the tenth year's premiums if $100,000 should be so secured, 7 per cent. on the second to the tenth year's premiums and 5 per cent. on all subsequent premiums during the lives of the policies, not exceeding 20 years, if $500,000 should

be so secured in any fiscal year, and $2 for each $1,000 of insurance so secured and $2 annually thereafter on all such insurance in force, regardless of whether he should remain in the employ of the company or not. Prior to December 1, 1903, no term had been fixed for the continuance of the agency, but in the supplemental agreement of that date by which the second $1 per annum per $1,000 of insurance secured and remaining in force was added to Mr. Tiernan's compensation, a stipulation was made that the contract should not be terminated by either party for 5 years after it should take effect. On December 5, 1903, four days after that stipulation was made, the supplemental contract here in controversy was signed.

When that contract was first read, it seemed clearly to provide that, on condition that the plaintiffs should not enter the life insurance business for any other company in Tiernan's territory for 5 years after the termination of the agency contract, but not otherwise, if that contract should be terminated without cause, he should be allowed and paid the compensation derivable from the renewals specified in the contract. Only four days before, these parties had agreed that the contracts should not be terminated for 5 years, except for cause. It was not unnatural that upon consideration they should become anxious to know, and hence to agree, what the one should pay and the other should receive, if the agency should be terminated for cause, and what if it should be terminated without cause. It is evident from the contract that they expected that Tiernan would procure a large amount of the insurance which the company expected to write. The company knew that he and his employés would thus become intimately acquainted with and continue to have great influence on the policyholders they procured, and that they might and probably would be able to draw them from it to any other company for which they should engage in the insurance business. Each of the parties to the contract doubtless feared that if, under their 5-year stipulation, it was terminated by either party within the term for cause, the other party could recover nothing on that account, and that if it was terminated by either party without cause he could recover nothing, and that if damages were sought in either case the question of the sufficiency of the cause and the uncertain and speculative nature of the possible damages, if any, might make the claim of the disappointed party of little value and a fruitful cause of controversy and expense. So it was that, conceding, without considering or deciding, that the termination of the contract in this case was without cause, it seemed, when this contract was first presented, that by it the parties had intended to agree and had agreed that in case of such a termination Tiernan should receive on account thereof in lieu of damages the compensation resulting from the renewals specified in the contract on condition that he did not enter into the life insurance business in his territory for any other company during 5 years after the termination, and that the plaintiffs had elected not to comply with this condition, and could not recover in this action.

[6] Counsel for the plaintiffs have presented with great ability, force, and ingenuity many arguments in opposition to this view, and they

have all had thoughtful consideration. They say that, notwithstanding the agreement upon the compensation which the plaintiffs should receive in case of a termination of the contract without cause, and notwithstanding the fact that they elected not to comply with the condition on which it was agreed they might recover this compensation, they may have general damages, measured by their lost future profits as for a breach of the contract, and among other authorities they cite in support of this contention General Bill Posting Company v. Atkinson, [1909] A. C. 118; Measures v. Measures, [1910] 2 Ch. 248; Pordage v. Cole, 1 Saunders, 319, and the notes thereto; Ellen v. Topp (1851) 6 Exch. 424, 442; Campbell v. Jones (1796) 6 Durnford's & East's Reports, 570; White v. Beeton (1861) 7 Hurlstone & Norman's Reports, 49; Freeth v. Burr, 9 L. R. C. P. 208. The opinions in these cases and in others cited have received perusal and meditation, but they are not deemed controlling, or even applicable to the facts in this case. In some of them, as in the Bill Posting Case, there was a contract of employment for a fixed term, a covenant of the employé not to engage in like employment for a certain time, a discharge of the employé without cause, a recovery by the employé of a judgment for damages, a subsequent engagement by the employé in a like employment for a competitor, and a refusal by a court of equity to enjoin him from continuing in that employment. But in none was there, as there is in this case, a solemn written contract between the employer and the employé, which expressly limited and fixed the amount and character of the compensation or damages which the employé should recover in case of termination of his contract or employment without cause, and expressly specified the condition upon a compliance with which alone he should recover it. But such is the contract which conditions the judgment which should be rendered in the case at hand. It is a lawful and rational contract, and it renders the decisions here invoked inapplicable in this case. There is a wide difference between a nonfulfillment of a contract which the parties contemplated when they made it, and the effect of which they clearly intended to and did fix and limit by the express terms of their agreement, and of one the parties to which did not contemplate, and in which they did not stipulate, the effect of the nonfulfillment.

[7] Counsel argue that there was no consideration moving to Tiernan on December 5, 1903, for his promise not to engage in the insurance business for five years after the termination of the contract without cause. But the promises of the defendant in that agreement, which induced Tiernan to sign it, must be considered ample consideration to sustain the promises he made therein. They contend that the condition of the agreement of December 5, 1903, that Tiernan should not enter into the life insurance business for another company within 5 years after the termination of his contract does not qualify or refer to the clause therein relating to the termination without cause, but to the previous clause, which refers to its termination with cause. But if such had been the intention of the parties, they would naturally have written it into the contract immediately after that clause. On the other hand, they placed that clause first, followed it immediately

with the clause which fixed the plaintiff's compensation in case of a termination of the contract without cause, and placed the clause which imposed the condition immediately thereafter. The form of the contract, the order of its clauses, the object of it, and the intention of its makers which its first reading impressed upon the mind, and which repeated perusals and study have confirmed, persuade to the conclusion that the condition qualifies and governs the clause of the agreement of December 5, 1903, which relates to the termination of the agency contract without cause.

It is said that the plaintiffs are not subject to the condition, because they do not bring this action for the compensation stipulated to be paid on the renewals, that they do not bring it for the commissions or bonuses on renewals, and that they do not bring it on the contract, but that they bring it for general damages for its breach, and that they are therefore not subject to the conditions. This claim is not convincing, because the damages which they sought and for which they have the judgment are nothing but the value of those future commissions and bonuses on renewals, and without the contract they could recover nothing. The fact is they are seeking to recover on a part of the contract, when the entire contract and their election not to comply with the agreed condition of their recovery forbid it.

[8] It is contended that the stipulations of the contract were mutually executory and dependent, that the plaintiffs first breached the contract by terminating it without cause, and that this breach estopped it from enforcing the condition, on the ground that the party who makes the first breach is estopped from recovering or defending on the contract. There might, perhaps, have been force in such a contention, if this contract had not contained the condition. But it does contain it, and what counsel call a breach is the very termination without cause which the parties contemplated and stipulated the effect of when they made the contract, and that stipulation and the plaintiffs' election not to comply with the agreed condition of their claimed recovery forbid it. They may not have a recovery upon a part of the contract which is forbidden by the whole contract and the admitted facts.

[9] Counsel for the plaintiffs present another question. They insist that, even if the plaintiffs are barred from a recovery on account of the commissions on the renewal premiums by the writing of December 5, 1903, nevertheless they may sustain a recovery on account of the bonuses on the respective amounts of the renewal policies, because the parties did not intend that that writing should, and it did not, affect their rights thereto. They say:

"The contract of December 5, 1903, did settle and determine the extent of the interest of the agent in renewal premiums, whether the relation was terminated for or without cause; but it does not pretend to and it does not fix and determine the right of the agent to recover any other item of damage which he might suffer and be able to establish by competent proof."

In support of this position they cite the provision, found in each of the supplemental contracts of November 28 and December 1, 1903, that there shall be paid to the agent "an additional compensation of

$1 for each $1,000 of insurance procured by or through his agency, * * * and thereafter annually a fee of $1 for each $1,000 in force on all business which said party of the first part is caused to issue under the terms of such contract, regardless of whether said party of the second part remains in the employ of the party of the first part," and the fact that by the supplemental contract of March 25, 1904, the defendant agreed to pay an additional bonus of $3 per $1,000 on certain new business procured by Tiernan. It is well to fix and then to bear carefully in mind exactly what the nature and character of these bonuses were, and how, if at all, they differ from the commissions on the renewal premiums. The bonuses on account of which the plaintiffs have recovered a part of their judgment in this case are the annual promised payments of $2 per $1,000 of insurance annually on insurance procured by the plaintiffs that was in force in the respective years subsequent to 1906. The policies expired each year, unless preserved by the payment of renewal premiums. As the annual bonuses were payable on the insurance procured by the plaintiffs which remained in force in each respective future year only, and as none of the insurance that conditioned the right to receive these bonuses could be in force in any such year, unless that insurance had been renewed, they were conditioned by the same renewals as the renewal commissions on the premiums. In truth they were renewal commissions of $2/1000$ of the renewed insurance, upon the renewal premiums on which the defendant agreed to pay the specified hundredths or percentages of premiums fixed in the contract. They were of the same nature and character as the commissions on the premiums and the liability to pay them was conditioned by the same renewals.

The stipulations for these annual bonuses or commissions of $2/1000$ per annum of renewed insurance were made in the supplemental contracts of November 28 and December 1, 1903. The latter contract contained the stipulation that the agency contract should not be terminated except for cause. It is conceded, however, that the contract of December 5, 1903, modified that stipulation, and fixed the rights of the parties thereunder, by virtue of the rule that a subsequent contract between the same parties relating to the same subject-matter prevails over its predecessor. By the same mark the parties to this contract had the lawful right and power by the subsequent agreement of December 5, 1903, to terminate, extend, or modify the provisions of the contract of November 28 and December 1, 1903, that the bonuses of $2 per $1,000 of the annual renewed insurance should be paid, whether or not the agents remained in the employment of the defendant, and, if they intended so to do, and that intention is evidenced by the terms of the writing, by its purpose, and by the situation of the parties, it must prevail.

[10] It is conceded that the original and supplemental agreements constitute a single contract, and that they must be read and construed together. Each of the supplemental contracts refers to the original contract, and then proceeds to extend, limit, or modify it. The result is that any reference to that contract, or to any section of it, in

these subsequent contracts, becomes a reference to that contract or section as it had been modified, limited, or extended at the time the reference was made. When the writing of December 5, 1903, was made, the parties had met, as has been concluded, for the purpose of definitely fixing by agreement the effect of a termination of the entire agency contract for cause and without cause. When by the writing of that day they agreed that, if the contract should be terminated for cause, "the renewal interest of the party of the second part, as recited in section 21 of said contract, shall be continued under the terms and conditions thereof for a period of 5 years from termination of that contract," they did not intend to, and they did not, agree that the renewal interest, as it was specified and limited in that section when the original contract was signed, only, should be so continued, but that that renewal interest as it stood on December 5, 1903, under all the previous extensions and modifications of section 21 which had been made, should be so continued.

Were not the annual bonuses or commissions of $2/1000$ of the insurance which the plaintiffs had procured, and which should be renewed and put in force in any year, a part of the renewal interest of the plaintiffs specified in the contract of December 5? If there had been or should be no renewals in any year, that interest then ceased, its extent and value was measured by the amount of the renewals, and this question must be answered in the affirmative. When the writing of December 5, 1903, came to treat the termination of the contract without cause, it provided that, should the contract be terminated by the defendant without cause, "the renewals shall continue as recited in said section 21, all of which renewals are subject to the collection charge of 1 per cent. as specified in section 14 of said contract." Were not the bonuses the annual commissions of $2/1000$ of the insurance procured by the plaintiffs in force in the respective years after 1906 as much a part of the "renewals" as the commissions on the premiums on that insurance? They were all conditioned and measured alike by the renewals of the same policies, and this query may not be rightfully answered in the negative.

The fact must not be disregarded that section 21 of the original contract treated exclusively of and fixed the compensation which the agents should receive for renewals, so that as long as that section remained unchanged they were entitled to receive on account of the renewals no more and no less than the compensation there stated, and that each subsequent stipulation in the supplemental contracts as to such compensation on account of renewals, including the stipulations as to the compensation on account of the annual $2/1000$ of the renewed insurance, was a modification and amendment of, and as soon as it was made became a part of, that section. In view of these considerations, of the express terms of the writing of December 5, 1903, of its apparent object to change and definitely fix the entire effect of a termination of the agency contract, whether with or without cause, of the situation of the parties, and of the naturalness and reasonableness of such a purpose and intent, the contention of counsel for the plaintiffs that the parties did not intend, and did not agree by

the writing of December 5, 1903, to affect the plaintiffs' right to the annual bonuses or compensation on account of the future renewals of the insurance secured by the plaintiffs for the defendant, is not persuasive and cannot be sustained.

And the conclusion which argument, research, and meditation have forced upon the mind is that with which it was impressed on the first reading of this contract, that the parties to it intended to and did agree that, in case of a termination of the agency contract without cause attributable to the plaintiffs, they should receive on account of that termination the compensation resulting from the renewals specified in the contract, on condition that they did not enter into the life insurance business in their territory for any other company during 5 years after the termination, and that as they elected, doubtless wisely, not to comply with this condition, but to devote themselves to the insurance business for another company, they cannot recover in this action. Chase v. New York Life Insurance Co., 188 Mass. 271, 74 N. E. 325, 326; Herrick v. N. Y. Life Insurance Co., 202 Mass. 478, 88 N. E. 1092; Barton v. Travelers' Ins. Co., 84 S. C. 209, 66 S. E. 118, 119, 120.

[11] There is another reason why, if there were error in the conclusion already announced, the judgment in this case could not be sustained. It is that an examination of the record has convinced that there was no substantial evidence to sustain the referee's finding of fact to the effect that the value of the defendant's future profits, lost by the termination of the contract, was $76,469.47 on September 22, 1906. That finding rests upon the testimony of Mr. Glover, an expert actuary, whose evidence impresses with his fairness and truthfulness, but when read in connection with the entire record, including the findings of the referee relative to the history, financial condition, business, and prospects of the defendant in 1906, before the termination of the contract, convinces that the basis of his estimate and testimony as to that value was inapplicable to this case. The value of those profits was conditioned by the probable continuance in business of the defendant and by the probable rate of renewal or of lapsation of the insurance procured by the plaintiffs and in force on September 22, 1906, which would have prevailed thereafter if the contract had not been terminated. Mr. Glover testified that by experience, investigation, and research actuaries had learned that there was a normal rate of such renewals or lapsation of policies of sound companies under normal conditions, that he based his estimate and testimony of the value of the lost future profits upon that rate, that he told the plaintiffs who procured his testimony that all he could do here would be to give them the rate under normal conditions, because he did not examine the defendant company, had not the time to do so, and that he did not wish to go on record as furnishing an opinion concerning the Chicago Life Insurance Company because he did not know anything about it. Asked what he meant by normal conditions he answered:

"I should say a company like the Northwestern Mutual is now moving along under normal conditions. It has the confidence of every policy holder and its rates are believed by the policy holders to be equitable and just, its agents

263 F.—22

are fair, there is nothing in the air, no criticism or suspicion attaching to it, except the little quibbles of competitive agents back and forth—everybody believes them."

It is therefore on the normal rate of renewals or of lapsation of old-established financially sound insurance companies, whose continuance in business in that condition for many years seems assured, that the value on September 22, 1906, of the probable profits of the plaintiffs for 19 years thereafter have been estimated and embodied in the judgment in this case. But the evidence and the findings of the referee satisfy beyond doubt that the defendant was not such a company, that it had not been, was not, and probably never would be, under such conditions, and that before the termination of the agency contract in 1906 there was no reasonable probability that it would continue in business 19 years, or any considerable part thereof. The findings and persuasive evidence relative to these subjects established these facts:

The defendant company in 1906 was a new company. It commenced business January 1, 1903, with a subscribed capital stock of $150,000 and a subscribed surplus of $150,000. During the years 1903 and 1904 there were serious controversies between certain of its stockholders, which led to lawsuits in the courts of the state of Illinois to cancel certain stock which it had issued, and to change the control of the board of directors, and these suits resulted, among other things, in a change of the officers of the company. This litigation attained considerable notoriety through the newspapers of Chicago and insurance journals. During the years 1903, 1904, 1905, and 1906 the defendant failed to set aside or accumulate any of the amounts necessary to meet the estimates of surplus which it had shown to policy holders and used to induce them to take participating policies. Its expenses were in excess of its margins for expenses by $40,917.43 in 1903, by $70,269.63 in 1904, by $55,793.97 in 1905, and its actuary testified that the result of its operations in 1906 paralleled those of the previous years. On and prior to September, 1906, its capital stock had become considerably impaired, one state in which it had been authorized to do insurance business had revoked its authority, and other states were threatening like action. Its annual reports to the insurance department of the state of Illinois showed its capital to have been impaired $66,018.94 at the close of the year 1903, $113,964.81 at the close of the year 1904, and $159,795.17 at the close of the year 1905.

The normal rate of lapsation of insurance in established sound companies with a going business under normal conditions is, according to the evidence, from 8.17 per cent. to 20 per cent. during the first policy year, and about 10 per cent. during the second policy year, making a maximum of about 30 per cent. for the first two years. The lapsation of insurance procured by the plaintiffs in 1904 was about 47 per cent. during the 1¾ years between 1904 and September 22, 1906. The actuary of the defendant testified that the lapsation of insurance procured by the plaintiffs and in force on September 22, 1906, between that date and December, 1908, was about 77 per cent., while the lapsation of other insurance of the defendant in force on September 22,

1906, was about 53 per cent., and the evidence leaves no doubt that the rate of lapsation of the former was much higher than that of the latter after the plaintiffs elected in December, 1906, to engage in the insurance business for the Central Life Insurance Company, and to solicit the policy holders they had secured for the defendant to take new policies in the Central Company. Such was the brief, disturbed, and stormy career of the defendant. Every new life insurance company is necessarily somewhat experimental during the first 5 or 10 years of its existence, and the defendant was a steadily failing experiment in insurance business from beginning to end. The findings and evidence convince that there was no substantial evidence in the case that there was a reasonable probability, in September prior to the termination of the agency contract, that the defendant would or could continue in the insurance business during the 19 years thereafter during which it is charged with the loss of the plaintiffs' profits in this judgment, or during any considerable portion of that time, or that the lapsation of insurance while it did continue would be as low, or even approximately as low, as that of old established, financially sound companies under normal conditions. So it is that there is no substantial evidence to sustain the findings or judgment based on the normal rate.

[12] Perhaps, in view of the established rule that the anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their amount cannot be recovered, because it is not susceptible of proof with any reasonable degree of certainty, and of the exception to this rule, to wit, that the loss of profits from the destruction or interruption of an established business may be recovered, when the plaintiff makes it reasonably certain, not by conjectures or unwarranted estimates of witnesses, but by facts from which the loss and the amount of the damages are logically and legally inferable, the alleged lost profits in this case were not susceptible of proof. The speculations and conjectures of witnesses, who know no facts from which a reasonably accurate estimate can be made, form no better basis for a judgment than the conjectures of a jury without facts. Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 98, 49 C. C. A. 244, 246; McSherry v. Dowagiac Mfg. Co., 160 Fed. 948, 961, 89 C. C. A. 26, 38; Montgomery v. Chicago, B. & Q. Ry. Co., 228 Fed. 616, 620, 143 C. C. A. 138, 142; McCornick v. U. S. Mining Co., 185 Fed. 748, 751, 108 C. C. A. 86, 99; Penna. R. R. v. International Coal Co., 230 U. S. 184, 207, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Hollweg v. Schaefer Brokerage Co., 197 Fed. 689, 701, 117 C. C. A. 83, 95; Yates v. Whyel Coke Co., 221 Fed. 603, 607, 137 C. C. A. 327, 331.

[13] The defendant asserts, and the plaintiffs deny, that it is entitled to a judgment of $11,642.60 and interest from September 22, 1906, because on that day the plaintiffs owed it $6,595, which it had advanced and loaned to them, to be paid back out of the renewal premiums the plaintiffs should earn under the contract, and the plaintiffs had collected renewal premiums, $5,047.60 of which was the property of the defendant. The plaintiffs contend that the defendant is

not entitled to recover any of this amount, because it terminated the contract without cause, and thereby prevented them from earning or collecting any part of the renewal premiums subsequently paid. The answer is that the plaintiffs, by fulfilling the condition and performing the promise that they made in the supplemental contract of December 5, 1903, could have earned and collected the commissions and bonuses agreed upon therein, in case of a termination of the agency contract without cause, and they elected not to do so, and thereby deprived themselves thereof, and for that reason they cannot escape liability to pay the $11,642.60 and interest on the ground stated by their counsel.

Upon the writ of error which the plaintiffs sued out, they assert that the court below erred, in that it did not award and render judgment for them for $85,918.62 more than the amount of the recovery it adjudged, $63,331.73 on account of the lost profits they would have made out of the new business they would have secured, if the company had continued in business until the end of the 5 years without terminating the agency contract, and $22,586.88 on account of the excess of the expenses of their agency over the commissions and bonuses they received prior to September 22, 1906. But the conclusion that has been reached as to the meaning and effect of the condition in the supplemental contract of December 5, 1903, and the plaintiffs' election to engage in the insurance business for the Central Company, are fatal to these claims. The plaintiffs also claim that they were entitled to receive interest on the amount of the judgment against the defendant; but, as the conclusion is that they were not entitled to that judgment, they are not entitled to interest on it.

The conclusion of the whole matter is that the judgment below must be reversed, with costs against the plaintiffs on both writs of error, and the case must be remanded to the court below, with directions to render a judgment against them for $11,642.60 and interest thereon at the legal rate from January 1, 1904, when they had elected to engage in the insurance business in their territory for the Central Company; and it is so ordered.